UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TRAVIS L. PETERSEN,

    Petitioner,

    v.                                                Case No. 21-CV-245

LARRY FUCHS,

    Respondent.

---

### DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DISMISSING CASE

---

    Travis L. Petersen, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petersen was convicted of first-degree intentional homicide and sentenced to life imprisonment. (Habeas Petition at 2, Docket # 1.) Petersen alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

### BACKGROUND

    Petersen was charged with first-degree intentional homicide arising from the death of Robert Kasun at the Mount Morris Motel in Wautoma, Wisconsin. (Ex. to Habeas Petition, *State of Wisconsin v. Travis L. Petersen*, 2018AP1568 (Wis. Ct. App. Sept. 25, 2019), Docket # 1-1 at 2.) Kasun was found dead in his motel room on March 6, 2013, with injuries police believed were consistent with a physical altercation. (*Id.* at 2–3.) The autopsy indicated that Kasun had suffered blunt force trauma that fractured his orbital bones, a portion of his skull, and ten rib bones, and severed his aorta. (*Id.* at 3.) Police made contact with Petersen, who was staying in the motel room next to Kasun's. (*Id.*) Petersen admitted

to police that he had been drinking beer with Kasun in Kasun's room on the afternoon of March 5, 2013, but he asserted that he left Kasun's room around 3:30 p.m. and denied hurting Kasun. (*Id.*) Further investigation by law enforcement revealed bloody footprint evidence in Kasun's room that appeared to have been left by a person not wearing shoes. (*Id.*) It also revealed bloody footprint evidence in Petersen's room. (*Id.*) Police obtained photographs of Petersen's feet, and they believed that the footprints from both rooms were consistent in size and shape with Petersen's feet. (*Id.*) An analysis by the Wisconsin State Crime Lab indicated that blood evidence retrieved from a rug in Petersen's room belonged to Kasun. (*Id.*)

At trial, the jury heard testimony from Joseph Voit, an inmate who was incarcerated with Petersen in the same cell block in the Waushara County Jail from June to September 2013. (Answer, Ex. H, Transcript of Jan. 7, 2015 Jury Trial ("Jan. 7 Tr.") at 242, 244, Docket # 9-11.) Voit testified that he and Petersen would speak about Petersen's case and that Petersen initially denied committing the murder. (*Id.* at 245.) Sometime after, Voit testified that he had a one-on-one conversation with a visiting minister who told him that Petersen "killed a man." (*Id.* at 246.) After returning to the cell block, Voit testified that he told Petersen that "Bible Bob is in there talking about . . . that you did this." (*Id.*)

After this conversation, Voit testified that Petersen began confiding in him more. (*Id.*) Voit testified that Petersen told him that he and Kasun were drinking in a motel room and that both men were pretty drunk. (*Id.* at 252.) Petersen told him that he and Kasun were taking about Kasun's military background, how "he was a 'bad-ass,'" and that "one thing

2

led to another" and Petersen "saw red and [ ] beat the man." (*Id.*) Voit testified that Petersen told him that he "snapped" and stomped Kasun with his feet and crushed his skull and ribs. (*Id.* at 252–53.) Voit testified that Petersen told him that he could feel the ribs being broken as they were being crushed. (*Id.* at 253.) Voit testified that Petersen told him he was not wearing shoes during the beating and that he got rid of the clothes he was wearing at the time. (*Id.*) Voit testified that the information from Petersen came over the course of months (*id.* at 256) and that he came forward because it was weighing on his conscience (*id.* at 257).

On direct examination, Voit was asked whether the government "ever cut any deals" with him, to which Voit responded "never." (*Id.* at 263.) On cross-examination, Voit was asked whether he was aware of a letter addressed to his defense attorney (Attorney Zilles) from the State talking about potential consideration for his testimony against Petersen. (*Id.* at 285.) Voit testified that if such a letter existed, he was not aware of it. (*Id.*)

Nick Stahlke, a forensic scientist with the Wisconsin State Crime Laboratory who processed the crime scene in Petersen's case, testified that Petersen had a book on his coffee table entitled "Abnormal Psychology: The Problem of Maladaptive Behavior." (Jan. 7 Tr. at 26.) A photograph depicting this book was entered into evidence as Exhibit 66. (*Id.*) During closing arguments, the State argued the following:

> Mr. Stahlke went through that room in detail to show you a couple things. He went through that room in detail, and I showed you those pictures . . . [Stahlke] also went through the room and provided details of some of that unusual things that you found in Travis Petersen's room that provides you a little bit of ironic insight on this case, the fact that Travis Petersen in his room right below the remote for his T.V. has a book on "Abnormal Psychology. The Problem of Maladaptive Behavior." Use your common sense and better

3

> judgment. Who has a book like that laying around? There is strong suggestion that Mr. Petersen himself knew his own problems.

(Answer, Ex. H, Transcript of Jan. 8, 2015 Jury Trial ("Jan. 8 Tr.") at 114, Docket # 9-12.) Petersen's counsel immediately objected, and the court sustained the objection. (*Id.*) The defense requested a curative instruction regarding the State's mention of the "Abnormal Psychology" book, arguing that it was inadmissible character evidence. (*Id.* at 167–68.) The court agreed, and both parties stipulated to the judge reading the following curative instruction to the jury:

> Ladies and Gentlemen of the Jury, during closing argument reference was made to Exhibit 66, which was a book found in the defendant's apartment. You should consider this book along with all other items found in the defendant's apartment for any value you believe it should have and are not to construe the book as indicating anything disparaging about the defendant's character.

(*Id.* at 169–71.) The jury was also instructed on the burden of proof using Wis-JI Crim. 140. (*Id.* at 99–101.) Petersen was ultimately convicted of first-degree intentional homicide and sentenced to life imprisonment. (Habeas Petition at 2.)

Petersen's appellate counsel filed a no-merit report seeking to withdraw as counsel. (Docket # 1-1 at 10.) Counsel raised four potential arguments, and Petersen responded raising six additional arguments. (*Id.* at 10–11.) As relevant here, Petersen argued that: (1) Voit testified with the hopes of leniency in his own criminal case and the State failed to disclose to the jury letters between the State and Voit's defense counsel and (2) the State improperly introduced the photograph of the "Abnormal Psychology" book and used it to prejudice the jury. (*Id.* at 11.) The Wisconsin Court of Appeals also noted that it

4

independently reviewed the entire record for potential meritorious issues and had previously placed Petersen's appeal on hold because the Wisconsin Supreme Court granted a petition for review in a case addressing the issue of whether Wis-JI Crim. 140, which was used at Petersen's trial, unconstitutionally reduced the State's burden of proof. (*Id.* at 11 n.2.) The court of appeals found, however, that the supreme court concluded in *State v. Trammell*, 2019 WI 59, 387 Wis. 2d 156, 928 N.W.2d 564, that Wis-JI Crim. 140 does not unconstitutionally reduce the State's burden of proof below the beyond a reasonable doubt standard. (*Id.*)

As to the issue of Voit's testimony, the court of appeals concluded that defense counsel *did* elicit from Voit that he told the detectives that he hoped for leniency when he provided information about Petersen. (*Id.* at 17.) The court of appeals further found that nothing in the letter between the State and Voit's defense counsel contradicted Voit's testimony that he had not received any deals in exchange for his testimony. (*Id.*) Rather, the prosecutor specifically stated that he could not make any promises or provide any consideration in exchange for Voit's testimony. (*Id.*) As such, the court found that the prosecutor had no obligation to present letters consistent with Voit's testimony. (*Id.*) As to Voit's argument regarding the State's mention of the "Abnormal Psychology" book during its closing argument, the court of appeals found that Petersen's counsel objected, and the court sustained the objection and issued a curative instruction. (*Id.* at 18.) The court of appeals concluded that juries are presumed to follow curative instructions. (*Id.*) Finding no

5

issues of arguable merit, the court of appeals affirmed the judgment of conviction. (*Id.* at 20.)

Petersen filed a petition for review with the Wisconsin Supreme Court, which was denied on March 17, 2020. (Docket # 1-1 at 5.) Petersen timely filed a petition for a writ of habeas corpus in this Court on February 23, 2021. (Docket # 1.)

## STANDARD OF REVIEW

Petersen's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

6

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Petersen raises three grounds for relief in his habeas petition: (1) that the State had a duty to disclose to the jury the letters between the State and Voit's defense counsel regarding sentencing consideration; (2) that the prosecutor's numerous mentions of Exhibit 66 denied

7

Petersen a fair trial; and (3) the use of Wis-JI Crim. 140 unconstitutionally reduced the State's burden of proof. I will address each ground in turn.

1.  *Letters Regarding Sentencing Consideration for Voit*

Petersen argues that he was denied due process when the prosecutor "remained silent" and "let the false testimony" of Voit go uncorrected. (Petitioner's Br. at 2, Docket # 10.) Specifically, Petersen points to Voit's testimony on the third day of trial. Voit was asked the following:

| | | |
|---|---|---|
| Defense Counsel: | | Do you recall Attorney Zilles sharing with you any correspondences that he was having with the State on your behalf for the Waushara County Case? |
| Voit: | | Just about my plea. |
| Defense Counsel: | | Were those communications you were having with your attorney just verbally whatever - - And I don't want you to go into detail, but what I'm wondering is if there was anything in written format, a letter, addressed to your attorney from the State, talking about potential consideration for your testimony. Did you ever recall - - |
| Voit: | | I'm not aware. |
| Defense Counsel: | | Okay. So if such a letter existed, you are not aware of it? |
| Voit: | | I'm not aware of it. |

(Jan. 7 Tr. 284–85.) Petersen argues, however, that Voit's testimony was false because two such letters did exist, one dated August 22, 2013 and another dated September 12, 2013. (Docket # 10-1 at 6–9.) The August letter is addressed to Attorney Zilles and is signed by

8

District Attorney Scott Blader. (*Id.* at 6–7.) In this letter, Attorney Blader states that the State is interested in Voit's information regarding Petersen's case and that the State has an offer in Voit's file regarding his Waushara County case. (*Id.* at 6.) The offer requests that Voit plead no contest to the burglary charge, with all other counts dismissed and read-in, with a recommendation for thirty months of initial confinement followed by four years of extended supervision. (*Id.*) Attorney Blader states, however, that he:

> [C]annot provide you any assurance that the State will amend this offer if [Voit] provides a statement. . . . Stated another way, I am interested in what Mr. Voit has to say but I cannot provide you any mitigated plea offers in exchange for that testimony. Instead, I can only give you my word that I will be willing to take into account his level of cooperation when discussing possible resolution to 13CF84 and 13CM282.

(*Id.* at 6–7.) In the second letter dated September 12, 2013, District Attorney Blader again states to Attorney Zilles that he "could not make any promises or consideration for his alleged statement" and that "[o]nce it is clear that there is a resolution to the homicide case – I will speak with you about what if any consideration Mr. Voit should be given for his statement." (*Id.* at 8–9.) Petersen argues that when Voit testified that he was not aware of any letters about potential consideration, District Attorney Blader was obligated to inform the jury about the existence of these two letters. (Petitioner's Reply Br. at 2–3, Docket # 14.)

In his brief to the court of appeals, Petersen argued that the State's failure to inform the jury about the correspondences between District Attorney Blader and Attorney Zilles violated his due process rights. (Answer, Ex. F, Docket # 9-7 at 4.) The court of appeals, however, found that the issue lacked arguable merit because the State had no obligation to

9

present evidence of letters that were consistent with Voit's testimony. (Docket # 1-1 at 17.) Specifically, the court of appeals found that Voit testified that he had not received any deals in exchange for his testimony, consistent with District Attorney Blader's statements in the letters that he could not make any promises or provide any consideration in exchange for Voit's testimony. (*Id.*)

Petersen did not specifically frame this issue as a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) in his brief to the court of appeals; rather, he made a general argument that his due process rights were violated. As such, the court of appeals does not cite or address this argument under *Brady*. Even so, the respondent does not raise procedural default as an affirmative defense (Answer, ¶ 2, Docket # 9); instead, he argues that the court of appeals did not unreasonably apply *Brady*. As such, I will address the merits of Petersen's *Brady* claim. *See Lewis v. Sternes*, 390 F.3d 1019, 1029 (7th Cir. 2004) ("[A] petitioner's procedural default does not implicate the jurisdiction of a federal habeas court. Rather, it is an affirmative defense, and like other defenses it is one that the State can waive.").

A petitioner is only entitled to habeas relief under *Brady* if he can show three things: "first, that the evidence at issue was favorable; second, that the evidence was suppressed; and third, that it was material to his defense." *Socha v. Richardson*, 874 F.3d 983, 987 (7th Cir. 2017). "And it is not really enough just to establish those points; instead, he must show that the decision of the state courts with respect to the *Brady* claim fails to meet the standards set out in AEDPA." *Id.*

10

Petersen has not shown the court of appeals' determination contravenes *Brady*. The court of appeals correctly held that nothing in Voit's testimony was contradicted by the District Attorney's two letters. What is clear from Voit's testimony is that, as he sat testifying that day, he had not gotten any deal for his testimony (Jan. 7 Tr. 263–64); however, he was certainly hoping that he did not "get slammed" in his pending cases (*id.* at 281) and had even requested leniency (*id.* at 282). Petersen's counsel thoroughly cross-examined Voit regarding the fact that he pled guilty to a charge in Waushara County in December 2013 but still had not been sentenced as of Petersen's trial in January 2015. (*Id.* at 283–84.) Petersen's counsel asked Voit about whether *he* knew of any letters sent between the District Attorney and his defense counsel, to which Voit testified that if any such letters existed, he was unaware of them. (*Id.* at 285.)

But even if the two letters were entered into evidence at that very moment, it would have contributed little to the cross-examination. The letters simply confirm that the District Attorney could not "provide [ ] any mitigated plea offers in exchange for [Voit's] testimony" (Docket # 10-1 at 6–7) and "could not make any promises or consideration for [Voit's] alleged statement" (*id.* at 8–9). However, the letters show that the District Attorney's office was willing to "take into account [Voit's] level of cooperation when discussing possible resolution" of Voit's cases. (*Id.* at 7.) This is consistent with the trial testimony—the State could not make Voit any promises, but Voit was hoping to get some leniency in his case in exchange for providing the information about Petersen. Moreover, Voit did not testify that no such letter or letters existed as Peterson argues. Rather, he testified that he was not aware

11

of them. Thus, it is not clear that the prosecutor showing the letters to the jury on redirect would have impeached or corrected Voit's testimony as Peterson argues. Regardless, Petersen's counsel effectively questioned Voit as to his motivation for coming forward and as to his hope that it would ultimately benefit him in his Waushara County case. Additionally, as the court of appeals noted, Petersen's counsel thoroughly cross-examined Voit regarding the fact that he pled guilty to a charge in Waushara County in December 2013 but still had not been sentenced as of Petersen's trial in January 2015. (*Id.* at 283–84.) The prosecutor showing the jury the letters would have done little, if anything, for Petersen's defense. For these reasons, nothing in the court of appeals' decision contravenes *Brady*. Petersen is not entitled to habeas relief on this ground.

    2.    *Prosecutor's Reference to the Abnormal Psychology Book*

Petersen asserts that the prosecutor's reference to Exhibit 66, first during Stahlke's testimony when the exhibit was entered into evidence and again during his closing argument, denied him from having a fair trial. (Docket # 10 at 3.) As described above, Exhibit 66 was a photograph of a book on Petersen's coffee table entitled "Abnormal Psychology: The Problem of Maladaptive Behavior." During the State's closing argument, the prosecutor argued that the fact Petersen possessed this book created a "strong suggestion that Mr. Petersen himself knew his own problems." (Jan. 8 Tr. 114.) Petersen's counsel objected, and the objection was sustained. The judge also issued a curative instruction at defense counsel's request.

12

While Petersen acknowledges that his counsel objected to the prosecutor's statement during closing arguments and that the court issued a curative instruction to the jury, he argues that curative instructions have only limited efficiency. (Docket # 10 at 5–6.) In finding this issue had no arguable merit, the court of appeals, citing *State v. Collier*, 220 Wis. 2d 825, 584 N.W.2d 689 (Ct. App. 1998), concluded that juries are presumed to have followed a curative instruction. (Docket # 1-1 at 18.) In *Collier*, the court stated that "[p]otential prejudice is presumptively erased when admonitory instructions are properly given by a trial court." 220 Wis. 2d at 837, 584 N.W.2d at 694.

Petersen has not demonstrated that the court of appeals' determination contravenes clearly established federal law, as determined by the Supreme Court. In fact, the Supreme Court has similarly held that:

> We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, *Bruton v. United States*, 391 U.S. 123, 136 (1968).

*Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987). In *Greer*, the Court held that to constitute a due process violation, the prosecutorial misconduct must "be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* at 765 (internal quotation and citation omitted). In determining whether a prosecutor's remark "rendered [the] trial fundamentally unfair," the remark must be placed in context of the trial as a whole. *Id.* at 766.

13

In this case, Stahlke testified as to the name of the book depicted in Exhibit 66 during his testimony (Jan. 7 Tr. 26), but no further questions were asked regarding the book. The book did not come up again until the State's closing argument, when the prosecutor argued that the "Abnormal Psychology" book provided "ironic insight" on the case and asked the jurors to use their "common sense and better judgment," reasoning that if someone has a book like that one "laying around," it must be that he "knew his own problems." (Jan. 8 Tr. 114.) But Petersen's counsel appropriately and immediately objected to the statement, and the objection was sustained. The court very shortly thereafter issued a curative instruction telling the jury to not construe the book as indicating anything disparaging about Petersen's character.

While I agree with Peterson that the prosecutor's remarks about the psychology book were a low blow, placing the statements in the context of the entire trial, Petersen cannot show that the court of appeals erred in finding no due process violation. Again, the first mention of the book was brief, and the statement made during closing was immediately objected to and a curative instruction was issued. Given the breadth of the other evidence in this case supporting the verdict, including Voit's testimony, the footprint evidence, evidence of the victim's blood found on the rug in Peterson's motel room, as well as the presumption that juries will follow a curative instruction, Petersen has not shown he is entitled to habeas relief on this ground. *See Greer*, 483 U.S. at 766 ("The sequence of events in this case—a single question, an immediate objection, and two curative instructions—clearly indicates that the prosecutor's improper question did not violate [defendant's] due process rights.").

14

3. *The Use of Wis-JI Crim. 140*

In considering Petersen's no-merit report and response, the court of appeals placed Petersen's appeal on hold due to the Wisconsin Supreme Court granting a petition for review in a case addressing the constitutionality of Wis-JI Crim. 140, which instructs on the burden of proof and presumption of innocence. This instruction was used in Petersen's case. In *Trammell*, the defendant argued that Wis-JI Crim. 140 unconstitutionally reduced the State's burden of proof. Specifically, the last two sentences of the instruction read as follows: "While it is your duty to give the defendant the benefit of every reasonable doubt, you are not to search for doubt. You are to search for the truth." In *Trammell*, the defendant, citing two law review articles based on separate but similar studies, argued that "when jurors are instructed to 'search for truth,' significantly higher conviction rates result." 2019 WI 59, ¶ 12. The *Trammell* Court concluded that:

> While picking and choosing various phrases or words from the instructions makes for an interesting argument, the instructions as a whole direct the jury to understand the presumption of innocence due to the defendant, remind it of the State's high burden, instructs that the defendant is due the benefit of the doubt and to soberly weigh and consider the evidence, testimony and witnesses presented at trial, and apply the law to the facts, reaching a sound conclusion based only on the facts and the law.

*Id.* ¶ 58. As such, the court found that Wis-JI Crim. 140 did not unconstitutionally lower the State's burden of proof.

Petersen does not argue that the court of appeals' determination was contrary to or an unreasonable application of clearly established federal law; rather, he simply argues that

15

this instruction "has been highly questioned" before and thus the court should not have used it when Petersen was facing a life sentence. (Docket # 14 at 7.)

In *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court held that the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt. *Id.* at 5. Wis-JI Crim. 140 undoubtedly does this, and the jury in Petersen's case clearly was instructed as such. (Jan. 8 Tr. 100.) For these reasons, Petersen has not demonstrated that he is entitled to habeas relief on this ground. *See also Lee v. Radtke*, No. 19-CV-411-WMC, 2020 WL 1154812, at *3 (W.D. Wis. Mar. 10, 2020) ("[T]his court is not aware of, nor has petitioner identified, any federal constitutional standard or law that is contrary to *Avila* or *Trammell*.").

Because Petersen has failed to show that he is entitled to habeas relief based on the grounds raised in his petition, his petition for a writ of habeas corpus is denied and the case is dismissed.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition

16

should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 and n.4).

Jurists of reason would not find it debatable that Petersen is not entitled to habeas relief. Thus, I will deny Petersen a certificate of appealability. Of course, Petersen retains the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 4th day of October, 2022.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge